### M‘Comb and Weeks, Executors of Ogilvie, *against* Wright.

It *seems*, that there is no difference in the construction of the 11th and 15th sections of the *statute of frauds*, (sess. 10. ch. 44. 1 *N. R. L.* 75.) or the 4th and 17th sections of 29 *Car.* 2. c. 3. as to what is a sufficient signing of the contract by the party to be charged.

An auctioneer is an agent lawfully authorized by the purchaser, either of lands or goods, at auction, to sign the contract of sale for him, as the highest bidder; and writing his name, as the highest bidder, in the *memorandum* of the sale, by the auctioneer, immediately on receiving his bid and knocking down the hammer, is a sufficient signing of the contract within the statute of frauds, so as to bind the purchaser.

Where the defendant bids, at auction, for another person, but does not, at the time the lot is knocked down to him, nor on the day of sale, disclose to the plaintiffs, nor to the auctioneer, the name of his principal, he is responsible as the purchaser.

If there is any doubt or difficulty as to the title, it will be referred to a Master to examine, and report thereon.

*THOMAS OGILVIE,* by his last will, dated the 8th of September, 1812, empowered his executors to sell his estate at auction, and to execute deeds for the real estate, to the purchasers in fee; and to divide the proceeds among his children, and appointed his wife and the plaintiffs, executors. The testator died on the 18th of *March,* 1816, and his wife died on the 12th of *May,* 1818. The plaintiffs, on the 13th of *January,* 1819, sold at auction a lot of land in *Beekman Street,* of which the testator died seised, to the defendant, who was the highest bidder, at 8,900 dollars. There was a printed paper containing the terms of sale: to wit, that the property was free and clear of all incumbrance, and the title unexceptionable: ten per cent. to be paid on the day of sale, and the remainder on the 1st of *May,* when deeds were to

<span style="float:right">*October* 30th, and *December* 16th.</span>

be given; 5,000 dollars on the lot in *Beekman Street*, might remain on mortgage. At the bottom was added, in writing, " interest to be paid half yearly. The lot in *Beekman Street*, to be sold subject to the opening and improving of *Beekman Street.*" The auctioneers, immediately after the sale, endorsed on this paper: " Lot in *Beekman Street*, bought by *Isaac Wright,* for 8,900 dollars. *New-York, January* 13th, 1819. *Hoffman & Glass;*" as a memorandum of the facts. The defendant bid, and the lot was struck off to him in the usual manner. The day after the sale, the defendant paid to the auctioneers the deposit of 890 dollars, according to the conditions of sale. The bill charged, that the defendant, by *Hoffman & Glass,* auctioneers, as his agents, signed an agreement, or memorandum, in writing, attached to the printed conditions of sale, acknowledging himself to be the purchaser, &c. That in *February* following the time of sale, the title deeds were delivered to the defendant, and remained with him for a month, to which he made no objection until about the 1st of *May;* that on the 1st of *May,* the plaintiffs tendered the deed of conveyance to him, and the possession, on his paying the residue of the purchase money, which the defendant refused. *Prayer,* that the defendant may be decreed specifically to perform his contract, and to pay the residue of the purchase money, on the plaintiffs executing to him a proper deed, &c. and for general relief.

The defendant, in his answer, admitted the sale at auction, and that some memorandum of the purchase was made by the auctioneers, *H. & G.,* at the time; that he was authorized by *Jeremiah Thompson* to bid for him, and did bid accordingly, the sum of 8,900 dollars. He denied that the auctioneers were his agents. He admitted the terms and conditions of the sale, and that, immediately after, he received of *J. T.* 890 dollars, being ten per cent. of the purchase money, which he paid to the auctioneers, to whom he declared, that the purchase was not for himself, but for *J. T.* He

admitted, that on the day of sale, or a few days thereafter, he requested the plaintiffs to have the deed made to *J. T.* That the plaintiffs never objected, but treated with *J. T.* as the purchaser, and had a deed made out to him, and which they tendered to *J. T.* as early as the 1st of *April.* That *J. T.* caused the title to be investigated and examined by counsel, who gave an opinion in writing, that the title was defective, and, for that reason, *J. T.* declined accepting the deed. That the plaintiffs negociated with *J. T.* as the principal in the purchase. He admitted, that the plaintiffs tendered to him a deed about the 1st of *May*, and showed him the opinion of the counsel in favour of the title; and that he refused to accept the deed. He submitted, that *J. T.* ought to have been made a party, and alleged the statute of frauds, of which he claimed the benefit, as if pleaded, &c.

The cause was brought to a hearing on the pleadings and proofs.

*Riggs* and *H. W. Warner*, for the plaintiffs. To show, that the memorandum of the contract of sale made by the auctioneers, was sufficient to satisfy the statute of frauds, they cited 2 *Taunt. Rep.* 38. 4 *Taunt. Rep.* 209. 3 *Vesey & Beames*, 57. 3 *Merivale's Rep.* 62. 3 *Burr. Rep.* 1921. 7 *East*, 565. 569. 14 *Johns. Rep.* 484.

*T. A. Emmet*, contra. He cited 1 *Esp. N. P. Rep.* 101. 2 *Esp. N. P. Rep.* 659. 1 *Bos. & Pull.* 306. 7 *Vesey*, 341. 13 *Vesey*, 456. *Sugden's Laws of Vend.* ch. 1. p. 25. 8 *East*, 248. 10 *East*, 283. 1 *Taunt. Rep.* 430. 5 *Taunt.* 170.

THE CHANCELLOR. The leading question in this case is, whether there was a valid purchase by the defendant, within the statute of frauds.

The premises were sufficiently described in the printed advertisement of the time and place of the sale at auction.

*1820.*

M'COMB
v.
WRIGHT.

*October 30th.*

The terms of sale were also particularly stated, viz: *ten per cent. to be paid on the day of sale, and the remainder on the first day of May following, when the deed and possession would be given, and 5,000 dollars of the purchase money were to remain on mortgage at the option of the purchaser.* To these printed terms there was added, in writing, at the bottom, " the interest to be paid half yearly, and the lot to be sold subject to the assessment of opening and im-proving *Beekman Street.*"

It is proved by the auctioneers, that the lot was sold to the defendant, subject to the terms and conditions stated and set forth in these printed and additional written terms, and that on the day after the sale, the defendant called and paid to them the ten per cent. on the purchase money. The defendant admits the condition of sale, and particularly that the lot was sold subject to the assessments for opening and improving the street. The terms of sale were well under-stood previous to the sale, and the defendant never made any objection or pretended to any misunderstanding on that point. The sale was also conducted in the usual manner ; the defendant signified the bid at which the lot was struck off to him, in the customary manner, and the auctioneers immediately made a memorandum of the fact, with a pencil, in these words, " lot in *Beekman Street* bought by *Isaac Wright* for 8,900 dollars. "They, also, im-mediately inserted the defendant's name in writing in an indorsement in the same words on the back of the paper to which the printed advertisement was attached, and on which the additional conditions were written, and to which in-dorsement the auctioneers' names were subscribed.

The sale was in *January,* and no difficulty or impedi-ment arose as to the contract of sale, or as to the comple-tion of the purchase, until objections were made in *April* following to the title, and on that ground the refusal to per-form the contract was placed. The suggestion that the

1820.

M'COMB
v.
WRIGHT.

contract was void by the statute of frauds, because the defendant had not signed any agreement or *memorandum*, was quite an afterthought, of which no trace appears until we come to the defendant's answer.

The question has been raised and well discussed by the counsel, whether the auctioneers were competent agents of the purchaser, for the insertion of his name in the *memorandum* of the sale. It will not be disputed, that if the purchaser's name appears in the body of the *memorandum*, and was inserted there by himself or by his authorized agent, it is a signing within the statute of frauds. This was settled by the Court of Errors in *Clason* v. *Bailey*. (14 *Johns. Rep.* 484.)

The words of our statute are, (1 *N. R. L. p.* 78. *sec.* 11.) that " no action be brought to charge any person upon any contract or sale of lands, or any interest in or concerning them, unless the agreement, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." The words of the statute in relation to the sale of goods, and which are to be considered in connection with the other provision, relating to lands, since the decisions on both the sections are frequently compared together, are as follows: (*ib. sec.* 15.) " No contract for the sale of any goods for the price of 10*l.* or upwards, shall be good, unless earnest be paid, &c. or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged, or their agent thereunto lawfully authorized."

It appears to be now settled, by the *English* authorities, that the construction of each of these sections, as to what is a signing by the party to be charged, is and ought to be the same, and that the auctioneer is a competent agent to sign for the purchaser either of lands or goods at auction; and the insertion of his name as the highest bidder in the *memorandum* of the sale by the auctioneer, immediately on

1820.

M'COMB
v.
WRIGHT.

receiving his bid, and striking down the hammer, is a signing within the statute, so as to bind the purchaser.

The case of *Simon* v. *Motivos*, (3 *Burr.* 1921. 1 *Black. Rep.* 599.) in 1776, is the earliest case we have on the subject. That was a suit against a purchaser of goods at auction who did not take them. He bid for one *Durant*, but did not name him as principal. The auctioneer, when he knocked down the goods to him, put down the defendant's name in the usual manner as the purchaser, and the defendant came the next day and saw the goods weighed. The question was, whether this was a contract in writing within the statute of frauds. The Court of K. B. held clearly, that the auctioneer must be considered as agent of the buyer, after knocking down the hammer, and that setting his name down in writing was sufficient to take the case out of the statute. The auctioneer was considered to be, to many intents, the agent of both parties. He was agent to the buyer, *pro tempore*, and giving in his name was an authority to the auctioneer to set down the contract.

The Judges in that case threw out a doubt whether sales at auction were within the policy and intention of the statute of frauds ; but that if they were, the requisites of the act were complied with.

Another decision on the same section of the statute, took place, after an interval of forty years. I allude to the case of *Hinde* v. *Whitehouse*, (7 *East*, 558.) decided in the K. B., in 1806. That was the case of a sale of goods, and the auctioneer immediately wrote the name of the purchaser against the lot of goods purchased ; the purchaser being sued by the vendor, he insisted that there was no *memorandum* in writing, within the statute, to charge him. But the Court held, that the auctioneer must be taken to be the agent of both parties, so as to bind the purchaser by his signature. It was considered that the practice had become so settled, and had been so uniformly held, since the

case of *Simon* v. *Motivos,* that the auctioneer was, at the sale, the agent of both parties, that it would be dangerous to shake the rule.

These are cases relating to the sales of goods; and I shall now notice a series of decisions on the other section of the statute relating to sales of land.

The first case was a *nisi prius* decision of Ch. J. *Eyre,* in *Stansfield* v. *Johnson,* in 1794. (1 *Esp. N. P.* 101.) Copyhold lands had been put up at auction, and knocked down to the defendant, and his name was written in the catalogue, against the lot, as the purchaser. He refused to pay and complete the purchase, and set up as a defence the statute of frauds. The Chief Justice admitted the defence to be good, and that the case of *Simon* v. *Motivos* applied only to a sale of goods. Afterwards, in *Buckmaster* v. *Harrop,* (7 *Vesey,* 341.) the same point arose before the Master of the Rolls, in Chancery. Certain estates were sold at auction to an agent of *F.,* and the agent, immediately after the sale, declared that he bought for *F.,* who offered to pay the deposit of 10 per cent., and the auction duty, to the auctioneer. A bill for specific performance was brought by the heir of *F.,* the vendee, against the representatives, including the residuary legatee of *W.* the auctioneer. The Master of the Rolls dismissed the bill, and observed, as Ch. J. *Eyre* did, that *Simon* v. *Motivos* did not extend to land, and that the name of the vendee, being put down by the auctioneer, was not sufficient.

It is to be observed, that it did not appear in that case, according to the report of it, that the auctioneer actually wrote down in a *memorandum,* the name of the purchaser. The case, therefore, is no authority, beyond the *dictum* of the Court. This same case was afterwards heard, on appeal, before Lord Ch. *Erskine,* (13 *Vesey,* 456.) and he said, as Lord *Eldon* had done before him, that the statute in both clauses, admitted of but one construction; that if the auctioneer put down the name of the purchaser, there·

was a contract in writing by an agent, and he should be disposed to say the statute was satisfied. But, he observed, that there was no clear evidence of any written *memorandum* so signed at the time.

The opinion of Lord *Eldon*, referred to in that case, was in *Coles* v. *Trecothick*. (9 *Vesey*, 249.) He there expressed a strong opinion, that an auctioneer, taking down the name of the buyer, was a signing within the statute, as to lands, and that it was impossible to hold otherwise, and leave the case of *Simon* v. *Motivos* undisturbed. " It was," he said, " very singular, that after, and without disturbing that case, it was held at *nisi prius*, by Lord Ch. J. *Eyre*, that it would not do as to land. Why not ? The form of the two clauses is not the same, but the terms, as to the *memorandum* in writing, were exactly the same." It was clearly now settled, he observed, that an agent need not be authorized in writing.

Thus far, the weight of authority is, at least, equal in favour of extending the doctrine in *Simon* v. *Motivos*, to the section relating to lands. It is rather stronger on that side; since the opinions of Lord *Eldon* and Lord *Erskine* are the latest opinions, and are founded on more consideration of the subject, and more argument. The observation of Lord *Eldon*, that the two clauses of the statute cannot be distinguished in this respect, is unanswerable, and renders the decision as to auction sales of goods, an authority perfectly applicable to sales of land.

But I proceed to later cases, which show that the point is now entirely settled at law and in equity. Indeed, as Lord *Eldon* observed, (18 *Vesey*, 183.) Chancery professes to follow the Courts of law in the construction of the statute of frauds.

In *Emmerson* v. *Heelis*, (2 *Taunton*, 38.) there was a sale at auction of a crop of turnips then growing upon the land, and the defendant, being the highest bidder, was declared to be the purchaser, and his name was written in the sale

bill by the auctioneer, opposite the lot of turnips sold. He signed no agreement, nor did the auctioneer, otherwise than by putting down his name as a purchaser.

The Court of C. B., decided that this was an interest in land within the 4th section (11th of our act) of the statute of frauds; that the auctioneer was agent for the purchaser, and the statute satisfied, because, the *memorandum* in writing was signed by an agent for the party to be charged. He writes down the purchaser's name, by authority of the purchaser, who bids, and announces his bid to the auctioneer for that purpose. He is, therefore, an agent for the purchaser, and a contract signed by such an agent, is binding; and an agent for the buyer need not be authorized in writing.

This plain and simple statement of the case, by Sir J. *Mansfield,* seems to render the argument too clear for much illustration.

The next case, on the same point, and to the same effect, is that of *White* v. *Proctor,* (4 *Taunton,* 209.) decided in the same Court, in 1811. One of the conditions of the sale of an estate, in that case, was, that the bidder should sign a contract for the purchase. The defendant, by his agent, was the highest bidder, and the auctioneer immediately entered his name, as the purchaser, and the price, in a *memorandum* paper of the lot and terms. There was no other signature, and the defendant, by his agent, refused to sign the written contract of the purchase. The name of the auctioneer was not written on the paper. The Court held, that the omission of the auctioneer's name was immaterial, and that this case could not be distinguished from the other. " Entering the name of the buyer, by the auctioneer, in his book, was just the same thing as if the buyer had written his own name."

These decisions at law were followed by Sir *Wm. Grant,* in *Kemeys* v. *Proctor,* in 1814. (3 *Ves. & Bea.* 57.) The defendant, by his agent, bid at auction for an estate, and it was struck off to him, and the auctioneer immediately made

a *memorandum* in his sale book, that the defendant was the purchaser. The defendant, when the parties retired to settle the deposit, refused to pay the deposit, or sign the agreement. The bill was then filed against the vndor, to compel a specific performance, and it was accordingly decreed. The Master of the Rolls, said he felt himself bound by the two consecutive judgments in a Court of law, though if the question was open, he should say the auctioneer was not the agent of the buyer.

The question before me is, therefore, definitively settled in the *English* Courts, and they all proceed on the decision in *Simon* v. *Motivos*, by Lord *Mansfield*, upwards of fifty years ago; that case settled the fact of the agency of the auctioneer, for the buyer, when he enters his name, by his direction, upon his bid, in the *memorandum* of the sale, which is a bill of particulars of all the essential terms of the contract. If that case was well decided, all the cases that followed it were correctly decided, for there is no distinction in the construction of the two sections of the statute, as to what is a proper signature of the buyer by his agent. That case is a binding authority, and ought not to be shaken, for it has been the uniform rule ever since, as well with us as in *England;* and it appears to me, that there is no answering the short and decisive reasoning which the *English* Judges have employed in support of that construction.

The present case comes up to those in the *English* Courts, in all points, and is stronger than most of them. Here was no condition of sale that the buyer was to sign a contract for the purchase, as in *White* v. *Proctor.* Here was no quick renunciation of the purchase, or alleged mistake, or misrepresentation, as in another of the cases cited. The defendant here called the next day and paid the deposit, and never thought of any other objection than the defect of title, until the bill was filed. I have no difficulty, therefore, in

concluding, that the defendant was legally bound by the sale.

Nor do I apprehend any great inconvenience from adhering to that settled construction of the statute of frauds. The history of auction sales does not warrant any such apprehension. They have too much publicity and solemnity attending them, to admit of much fraud or mistake; and Lord *Mansfield* and his brethren, thought these circumstances so strong, that they were led to doubt whether auction sales were even within the statute. To apply the statute to the case before me, would work a mischief not within its intention. A sale was made, in this case, in the usual manner; and all parties considered the contract as valid and binding, provided the title was good. The defendant carries it partly into effect; and after several months of negociation, the defect of title is alleged. If true, in fact, it is a good objection, but the defendant is not contented to abide by that objection. Perhaps, the property has since fallen in value, and the defendant now sets up, as a defence, that the case is within the statute of frauds. This operates like a fraud upon the plaintiffs, who have thereby lost an opportunity to sell.

2. But, it is further objected, that the defendant purchased as the agent of one *Jeremiah Thompson*, who ought to have been made a party, if not the sole party, since [the defendant, after the sale, disclosed that *Thompson* was the principal, and the plaintiffs negociated with him concerning the deed.

The answer to this is, that the defendant purchased as principal, and did not disclose to the plaintiffs, nor to the auctioneers, either at the sale, or on the next day, when he paid the deposit money, that he acted in the character of agent of *Thompson*. The contract was made with him, as principal, and he cannot withdraw himself afterwards from responsibility as such. To admit a party to do this, would lead to all kind of evasion, abuse, and fraud. In *Simon* v.

1820.

M'Comb
v.
Wright.

*Motivos*, the defendant bid for another person, but did not name him at the auction, as principal, and he was held responsible as the buyer. It is not true, in point of fact, that the plaintiffs ever recognized *Thompson* as the purchaser, and discharged the defendant. They uniformly treated with the defendant as the party bound to them, and were willing to insert *Thompson's* name as a grantee, merely to accommodate the defendant. The contract was entirely and absolutely with the defendant; there was no necessity for making *Thompson* a party to this suit, for the sub-contract between the defendant and *Thompson*, was *res inter alios acta*, and had nothing to do with the primary contract between the plaintiffs and the defendant.

I shall, accordingly, " declare, that the contract of sale between the parties was lawfully executed, and binding upon the defendant by the insertion of his name in the *memorandum*, which the auctioneers, as his agents for that purpose, did, in writing, immediately after taking down his bid; and I shall further declare, that the defendant did not, and could not, without the consent and agreement of the plaintiffs, (and no such consent and agreement appears,) withdraw himself from the obligation of the contract by presenting *Thompson* as his substitute, when he did not disclose, either to the plaintiffs, or to the auctioneers, at the time of entering into the contract, that he acted as agent for *Thompson*. And I shall direct the usual reference to a Master, to examine whether a good title can be given by the plaintiffs, for the house and lot sold to the defendant; and that he give to the defendant's solicitor due notice of the examination, and that the evidence taken in chief, in this case, on the point of title, be submitted to the Master, together with such other competent proof as the parties, or either of them, may think proper to furnish; and that he report an abstract of such title, together with his opinion thereon, with all convenient speed."

Decree accordingly.